**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**
*Electronically Filed*

| | |
|---|---|
| ERICKA PEACOCK JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:20-cv-601-DJH-CHL |
| v. ) | |
| ) | |
| EVOLENT HEALTH LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

\*\*\*\*\*\*\*

**INTRODUCTION**

Plaintiff Ericka Peacock Johnson thought her future at Defendant Evolent Health LLC looked bright. She had just been transferred to a new department and assigned to a new supervisor. While she was transitioning into her new role, Peacock-Johnson disclosed to her new supervisor and to the Human Resources department that she was pregnant with twins and would be taking FMLA leave when her babies arrived. Less than two weeks later, she was suddenly terminated. Peacock-Johnson brings causes of action against Evolent for pregnancy and sex discrimination under the Kentucky Civil Rights Act, FMLA interference, and FMLA retaliation. Peacock-Johnson respectfully requests that this Court deny Evolent's Motion for Summary Judgment and allow Peacock-Johnson's case to continue.

## COUNTERSTATEMENT OF THE FACTS

**I.      Factual Background**

    **A.      Peacock-Johnson's Employment at Evolent**

Ericka Peacock-Johnson began working at Evolent in June of 2018 for the position of business analyst reimbursement. (DN 35-2, Deposition of Ericka Peacock Johnson, Mar. 22, 2021, PageID #: 184-85). During her time at Evolent, Peacock-Johnson worked remotely and traveled to Evolent's office in Chicago as-needed. (DN 35-2, PageID #: 187). While Peacock-Johnson butted heads with her first supervisor, Clarice Maxwell, at times and Maxwell would micro-manager Peacock-Johnson, even Maxwell admitted that Peacock-Johnson "works well in supporting the [team of teams] that she is assigned to and assists where needed[.]" (DN 35-2, PageID #: 200; 2019 Performance Evaluation Excerpt, Evolent 0022, attached as Exhibit 1).

Under Evolent's progressive discipline policy, employees can receive verbal warnings, written warnings, and final written warnings. (Deposition of Jennifer Waiters, May 13, 2021, p. 11, attached as Exhibit 2). Employees can also be placed on "performance coaching plans" or "performance improvement plans" before being terminated. (Waiters depo at p. 11; Deposition of Suzanne Kambic, May 12, 2021, p. 44, attached as Exhibit 3). During her time at Evolent, Peacock-Johnson was never formally put on any sort of improvement plan. (Deposition of Clarice Maxwell, Jun. 30, 2021, pp. 23-24, 39-40, attached as Exhibit 4).

In December of 2019, Vice President of Configuration Heather Spencer and Vice President of Implementations Mary Piecuch initiated a meeting with Peacock-Johnson in which they offered her a transfer and promotion to a different position within Evolent: to join the Configuration Team as an analyst. (DN 35-2, PageID #s: 204-05; Emails between Peacock, Spencer, and Piecuch, Dec. 19, 2019-Jan. 2, 2020, PEACOCK_JOHNSON00090-91, attached as Exhibit 5; Kambic depo at

2

p. 9). Spencer and Piecuch told Peacock-Johnson that they believed the position would fit her skillset well, that it would involve working with multiple clients, and that the position would come with a pay increase. (DN 35-2, PageID #: 205-06, 210). Peacock-Johnson accepted the position. (DN 35-2, PageID #s: 204-05; PEACOCK_JOHNSON00090-91; Kambic depo at p. 9).

Employees must be fully trained and succeeding in their current positions in order to be eligible for a transfer. (Waiters depo at pp. 38-39). According to Evolent's Employee Handbook, promotions and transfers are given to "[q]ualified employees in good standing[.]" (Waiters depo at pp. 39-40). Employees must "be meeting job performance expectations to be eligible for promotion or transfer." (Waiters depo at pp. 39-40).

Managing Director of Configuration Suzy Kambic, who worked under Spencer, was aware that Peacock-Johnson was moved to the Configuration Team and confirmed that the decision to transfer Peacock-Johnson to the Configuration Team was final. (Kambic depo at pp. 8-9, 28). Kambic also confirmed that she knew about Peacock-Johnson's transition to the Configuration Team before January of 2020. (Kambic depo at p. 28). Kambic was kept in the loop about Peacock-Johnson's transfer to the Configuration Team because Peacock-Johnson was moving to the organization that reported to Kambic. (Kambic depo at pp. 28-29). Maxwell was also aware that Peacock-Johnson was going to take on a new analyst position in the Configuration Department. (Maxwell depo at p. 29). One spreadsheet documenting the plan that Peacock-Johnson was to work in the Configuration Department as an analyst was created on February 5, 2020:



(Maxwell depo at p. 30; Spreadsheet showing Peacock-Johnson transition plan to Configuration, Confidential—Evolent_0163, pending leave to file under seal as Exhibit 6).

On January 30, 2020, Peacock-Johnson reached out to Blake Lawson, Spencer's Chief of Staff, to ask if there were any updates on her transition to the Configuration Team. (Maxwell depo at pp. 35-36; Kambic depo at p. 15). Lawson replied stating that Peacock-Johnson would be getting more information about her role in the configuration department in the next week or so. (Email from Lawson to Peacock, Jan. 31, 2020, PEACOCK_JOHNSON000061, attached as Exhibit 7; Maxwell depo at p. 36). Lindauer began approving Peacock-Johnson's paystubs since Peacock-Johnson was now part of the configuration department. (Lindauer depo at p. 12). Peacock-Johnson's pay slips reflect that her pay increased in February of 2020. (Peacock-Johnson Payslips, Evolent 0041, attached as Exhibit 8; Maxwell depo at p. 42).

On February 10, 2020, Lindauer reached out to Peacock-Johnson to welcome her to the department. (DN 35-2, PageID #s: 207-08; DN 35-2, Emails between Lindauer and Peacock, Feb. 10, 2020, PageID #s: 230-31). Lindauer testified that she would not have sent such an email if she did not think Peacock-Johnson would be fully transitioning to the configuration team, as we the plan. (Lindauer depo at p. 33).

**B.     Peacock-Johnson Reports that she is Pregnant and Seeking Maternity Leave and FMLA Leave Shortly After Being Transferred to a New Department**

After being transferred to the Configuration Team, Peacock-Johnson filed requests for paid time off for February 20 and March 20, 2020. (DN 35-2, Page ID #: 211). On February 14, 2020, Lindauer asked Peacock-Johnson why she needed those days off. (DN 35-2, PageID #s: 211-12; DN 35-2, Emails between Lindauer and Peacock, Feb. 14, 2020, PageID #s: 233-35). Peacock-Johnson disclosed to Lindauer that she was pregnant. (Lindauer depo at pp. 16-17). Peacock-Johnson explained that she was pregnant with twins, so appointments would be more time consuming than with single-baby pregnancies, and that is why she asked for full days off instead of a specific window of time. (DN 35-2, PageID #: 213; Lindauer depo at pp. 37-38).

Peacock-Johnson asked Lindauer about FMLA and maternity leave, and Lindauer told Peacock-Johnson she would need to talk to the human resources department. (DN 35-2, PageID #: 213; Lindauer depo at pp. 17-18). Peacock-Johnson told Lindauer that she was fine with her telling Suzanne Kambic about the pregnancy since Kambic was Peacock-Johnson's Director in her new role and would want to know the reason behind the paid time off requests. (DN 35-2, PageID #: 213). This lines up with Kambic's testimony that she did find out that Peacock-Johnson was pregnant, but that she knows it was not from Peacock-Johnson herself. (Kambic depo at p. 17).

That same day after the phone call, Peacock-Johnson emailed the general human resources "Talent Team" department email account mailbox to ask about maternity leave and FMLA. (DN 35-2, PageID #s: 214-15; DN 35-2, Emails between Peacock, Human Resources, and Waiters, Feb. 14, 2020-Feb. 18, 2020, PageID #s: 237-41; Waiters depo at pp. 28-29, 31). Therefore, the following message went to an inbox to which many people in the Talent Team/HR Department had access:

> -----Original Message-----
> From: EPeacock@evolenthealth.com [EPeacock@evolenthealth.com]
> Sent: Friday, February 14, 2020 4:06 PM
> To: "Human Resources"
> Subject: Maternity Leave/FMLA
>
> Hello
>
> I wanted to know the steps you would take in submitting for fmla and maternity leave? I reviewed the site but I didn't see a fax number or paperwork.
>
> Thank you

(DN 35-2, PageID #: 240). The Human Resources inbox was accessible by both Managing Director/Vice President of Talent Patrick Devlin and Senior Director over Human Resources Melissa Gilliland. (Hargett depo at pp. 9-10; Waiters depo at p. 7).

Jennifer Waiters of the human resources department was assigned to address the email and responded from Talent Team mailbox "talentsupport@Evolent.com," asking for Peacock-Johnson's due date. (DN 35-2, PageID #: 215-16; Waiters depo at p. 30). Peacock-Johnson again specified that she was having twins, and said that because of that, her due date could be anywhere between July and August. (DN 35-2, PageID #: 216). Waiters worked a few levels below Devlin. (Waiters depo at p. 7).

After exchanging emails with Peacock-Johnson, Waiters added Peacock-Johnson to Evolent's Pregnancy Tracking Spreadsheet. (Waiters depo at p. 33; Evolent Redacted Pregnancy Tracking Spreadsheet, Confidential—Evolent_0171, pending leave to file under seal as Exhibit 9). Evolent's Pregnancy Tracking Spreadsheet was saved on a shared drive of Evolent's, and Waiters was not the only person with access to it. (Waiters depo at p. 34). According to Waiters, at least Kristine Dubois (Associate Director of the Talent Team) and Mara Jaffa (Senor Director of Talent)

6

had access to the spreadsheet. (Waiters at pp. 7, 34). Jaffa worked directly under VP of Talent Devlin. (Waiters depo at p. 7).

## C. Evolent Conducts a Reduction in Force

Evolent started planning a reduction in force in February of 2020. (DN 35-8, Ventimiglia Declaration, par. 7, PageID #: 367). Individuals who participated in the planning included Richard Ventimiglia, Melissa Gilliland, Patrick Devlin, and Kelly Riley. (*See* DN 35-7, Email from Ventimiglia, Feb. 10, 2020, PageID #: 284). During the preparation process for the reduction in force, some employees were added to the spreadsheet, and many employees were removed from the spreadsheet. (DN 35-8, Ventimiglia Declaration, par. 8, PageID #: 367). It is a disputed issue of material fact when Peacock-Johnson was added to the list to be considered for the reduction in force. The last was based on performance reviews for 2019, but by the time Evolent did performance reviews for 2019, Marie Lindauer was already listed as Peacock-Johnson's manager. (DN 35-2, PageID #: 194). However, Maxwell still evaluated Peacock-Johnson. (DN 35-2, PageID #: 194). Maxwell never went over the 2019 performance review with Peacock-Johnson. (DN 35-2, PageID #s: 193-94).

In one of the draft spreadsheets during the preparation for the reduction in force, it was noted that Peacock-Johnson's position would need to be backfilled if she was terminated, and that the backfill would need to be with a United States employee. (Kambic depo at p. 39; Evolent RIF Spreadsheet noting backfill needs, Confidential— Evolent_0164, pending leave to file under seal as Exhibit 10). In that same spreadsheet, the following note was present for an employee named Marilyn who Evolent was considering terminating: "She has been on short- and long-term leave off and on since being rehired and is currently on leave. Not sure of the rules in place when someone is on leave. Would gladly give up Marilyn without concerns." (Kambic depo at p. 38;

7

Evolent_0164). Evolent also terminated an employee named Chauntille Tarver while she was out on FMLA leave as part of a reduction in force. (Waiters depo at pp. 25-26). While most employees on the spreadsheets had detailed notes explaining why it would be a good or bad idea to terminate them, no notes existed for Peacock-Johnson. (Spreadsheets already referenced; Evolent Spreadsheet with Notes, Confidential – Evolent_0167, pending leave to file under seal as Exhibit 11; Kambic depo at pp. 35, 45, 48).

### D. Peacock-Johnson is Terminated Ten Days After Requesting Maternity and FMLA Leave and Less Than Two Months After Being Transferred to a New Position

On February 21, 2020, one week after Peacock-Johnson had disclosed her pregnancy to Evolent and the day after her first pregnancy-related appointment for which she had requested off, Maxwell sent Peacock-Johnson a meeting invitation for February 24, 2020. (DN 35-2, PageID #: 217). At the meeting, Maxwell and Cindy Hargett terminated Peacock-Johnson. (DN 35-2, PageID #: 217-18). Hargett told Peacock-Johnson that she was being terminated because her role was being eliminated. (DN 35-2, PageID #: 218-19). Peacock-Johnson reminded Hargett that she already knew that her role under Maxwell had been eliminated, but that she had accepted a promotion to a new role, so it should not matter that her role under Maxwell was being eliminated. (DN 35-2, PageID #: 219). Hargett told Peacock-Johnson that she didn't know anything about Peacock-Johnson's transfer. (DN 35-2, PageID #: 219).

Peacock-Johnson pointed out that the only thing that had changed between Peacock-Johnson accepting a transfer in December and being terminated in February is that she had reported to Evolent that she was pregnant and notified Evolent of her intent to take maternity and FMLA leave. (DN 35-2, PageID #: 219). Hargett claimed that HR had no knowledge of Peacock-Johnson's pregnancy, and Peacock-Johnson reminded Hargett that she had documented proof that

8

she had alerted HR to her pregnancy before receiving the invitation to the termination meeting. (DN 35-2, PageID #: 219). Nevertheless, Peacock-Johnson's termination stood and was effective the day she was told, and her email access was terminated immediately. (Emails between IT Helpdesk, Lindauer, Krabbe, Maxwell, Feb. 24, 2020, Evolent 25-26, attached as Exhibit 12; Evolent Final RIF Spreadsheet, Confidential— Evolent_0166, pending leave to file under seal as Exhibit 13).

Lindauer was not given an official reason for why Peacock-Johnson was terminated. (Lindauer depo at 14). Lindauer testified that it was very strange that she was not part of Peacock-Johnson's termination process or given an official reason for the termination since Peacock-Johnson reported to Lindauer. (*Id.*). Lindauer testified that it was abnormal that Peacock-Johnson was assigned to Lindauer as a transfer to the configuration department and then suddenly terminated before her work could fully transfer to the configuration department. (Lindauer depo at p. 15). Lindauer did not know that Peacock-Johnson was to be terminated until she received the termination notice. (Lindauer depo at p. 18). Lindauer reached out to Krabbe about it, and Krabbe knew about the termination. (*Id.*). Lindauer was not aware of any problems with Peacock-Johnson's work performance. (Lindauer depo at p. 22).

Shortly after Evolent terminated Peacock-Johnson, she saw adds for Evolent Analyst Configuration positions on glassdoor.com. (glassdoor.com Analyst, Configuration, PEACOCK_JOHNSON000085, 56-58, attached as Exhibit 14). In fact, Evolent has hired more than five configuration analysts since Peacock-Johnson was terminated, including Ashley Alvey. (Kambic depo at pp. 40-41). It has been necessary to hire additional analysts due to Evolent acquiring additional clients and needed additional workforce to handle all of the clients. (Kambic depo at p. 42).

## II.   Procedural Posture

Peacock-Johnson filed suit in July of 2020. (DN 1-1). The parties engaged in discovery. Among other things, Peacock-Johnson asked Evolent for "the name of every agent of Defendant involved in the decision to terminate Plaintiff, and the role each agent played in the decision to terminate Plaintiff. (Evolent's Answers and Objections to Peacock-Johnson's First Set, Dec. 22, 2020, Interrogatory No. 11, attached as Exhibit 15). Evolent identified Scott Fad and Heather Spencer as the "ultimate decisionmakers regarding Plaintiff's termination." Evolent also credited "Melissa Gilliland and Richard Ventimiglia from Evolent Human Resources" for being "involved in making decisions regarding the reduction in force[.]" Evolent further credited "Suzanne Kambric [sic.], Managing Director, Configuration" for "review[ing] the list of employees in her department affected by the reduction in force." Evolent said that "Cindy Hargett and Clarice Maxwell communicated the decision to Plaintiff." (Answer to Interrogatory No. 11). However, Kambic testified that she had no direct role in Peacock-Johnson's termination. (Kambic depo at p. 10). Kambic also testified that while she was given a list of individuals who would be terminated, she had no say on who was on that list. (Kambic depo at pp. 13-14). Scott Fad testified that he was not the decisionmaker in terminating Peacock-Johnson. (Fad depo at p. 37).

Evolent also only credited "performance" for how "it made determinations regarding who to terminate as part of its reduction in force[.]" (Answer to Interrogatory No. 13). However, all employees Evolent considered for the reduction in force had the same performance rating as Peacock-Johnson or lower, and the majority of the employees Evolent considered were not ultimately terminated. (*See generally*, Spreadsheets). And while the majority of employees who were considered had notes concerning why they should or should not be terminated, the only notes

for Peacock-Johnson were that Evolent would need to backfill her position with a United States employee and that her access should be "terminated immediately." (Spreadsheets).

Peacock-Johnson also requested as part of the discovery process "any e-mails between agents of Defendant that address Plaintiff's pregnancy, FMLA requests, performance, or termination" and "all charts, drawings, sketches, diagrams, etc. in the possession of the Defendant or its attorney, or other agents, or employees of the Defendant, that in any way related to the Plaintiff's claims or the defenses in this action." (Evolent's Responses and Objections to Peacock-Johnson's First RPODs, Dec. 22, 2020, Requests 8 and 9, attached as Exhibit 16). While Evolent did produce emails where Evolent agents referenced drafts of spreadsheets related to the reduction in force, it did not produce spreadsheets "UPDATED_Fad Ops_Low Perf_Detail_020720 .xlsx" or "UPDATED_Fad Ops_Low Perf_Detail_020720 sf rv wSalary Bonus.xlsx" that were attached to the emails. (DN 35-7, Emails between Ventimiglia, Gilliland, Devlin, and Riley, Feb. 9-10, 2020, Evolent_0048-51, PageID #s: 284-87; DN 35-8, Email from Ventimiglia to Gilliland, Feb. 13, 2020, Evolent_0052, PageID #: 375). It also did not produce PowerPoint presentation "FEB 2020 Headcount Chg.pptx" attached to a February 13 email. (DN 35-8, Email from Ventimiglia to Gilliland, Feb. 13, 2020, Evolent_0052, PageID #: 375).

On July 12, 2021, the very last day of discovery (*See* DN 27, PageID #s: 102-03), Evolent supplemented its 26(a) disclosures, listing Director, Talent Partner Kelly Riley as a person likely to have discoverable information for the first time. (Defendant's Second Amended Rule 26(a) Disclosures, Jul. 12, 2021, attached as Exhibit 17). Evolent stated that Riley was "expected to have knowledge regarding the reduction in force and termination of Plaintiff's employment." (*Id.*). Given that Evolent waited until the very last day of discovery to disclose that Riley had information that Evolent intended to use, Peacock-Johnson did not have an opportunity to depose Riley.

In Riley's Declaration, Evolent attempts to cure the fact that it did not produce the draft reduction in force spreadsheet attached to the February 9 and 10 emails (and the spreadsheet referenced but not attached to the February 11 email) by insisting that spreadsheets produced in a completely different place in Evolent's production with completely different names were the spreadsheets in question. (DN 35-7, Riley Declaration, pars. 11-12 *juxtaposing* Evolent_0048-51 with Evolent_0167 and Evolent_0054-55 with Evolent_0164, PageID #s: 280-81, 283-361). Evolent continued this strategy with Ventimiglia's Declaration, claiming that it produced the spreadsheet attached to the February 13 email by pointing to a spreadsheet produced in a completely different place in Evolent's production. (DN 35-8, Ventimiglia Declaration, par. 9 *juxtaposing* Evolent_0052 with Evolent_0168, PageID #s: 367, 375-97).

## STANDARD OF REVIEW

When considering a motion for summary judgment under Federal Rule of Civil Procedure 56(c), the Court "must view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 444 (6th Cir. 2009). Through this lens of favor to the non-moving party, summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Patterson*, 551 F.3d at 444 citing Fed. R. Civ. P. 56(c) (emphasis added). "When moving for summary judgment the movant has the initial burden of showing the absence of a genuine dispute to a material fact." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014). In cases of conflicting evidence, courts do not make credibility determinations as "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150

(2000). If a reasonable jury could possibly rule in favor of the non-moving party, summary judgment should not be granted. *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 444 (6th Cir. 2017). Evolent does not meet the summary judgment standard here, and a reasonable jury could find for Peacock-Johnson on all of her claims.

## ARGUMENT

Peacock-Johnson has brought causes of action against Evolent for sex and pregnancy discrimination under KRS § 344.010 *et seq.* ("The Kentucky Civil Rights Act" or "KCRA"), interference with access to leave under 29 U.S.C.S. § 2611 ("The Family and Medical Leave Act" or "FMLA"), and retaliation for seeking leave under 29 U.S.C.S. § 2611. All three claims involve a *McDonell Douglas* burden shifting analysis in which the plaintiff begins the analysis by establishing a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Then, the defendant must provide a legitimate, nondiscriminatory reason for terminating the plaintiff. *Id.* Once the defendant offers its reason, the plaintiff provides circumstantial evidence that the reason provided by the defendant is merely pretext for discrimination. *Id.* at 804. *Ammerman v. Bd. of Educ., of Nicholas Cnty.*, 30 S.W.3d 793, 897-98 (Ky. 2000). These elements work together to provide victims of discrimination, interference, and retaliation with a remedy even when the unlawful conduct is not obvious on its face. Likewise, all three claims can be supported by the Cat's Paw Theory. *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, 377 (6th Cir. 2017).

Under "Cat's Paw Theory," plaintiffs can demonstrate discrimination when a defendant employer's decisionmakers rely on information from subordinates with possible discriminatory animus in making an adverse employment decision regarding the plaintiff. *Coffman v. United States Steel Corporation*, 185 F. Supp. 3d 977 (E.D. Mich., May 5, 2016); *Welsh v. Automatic*

13

*Data Processing, Inc.*, 954 F. Supp. 2d 670 (S.D. Ohio, Jun. 20, 2013). When using both the *McDonnell Douglas* burden-shifting framework and the Cat's Paw Theory, plaintiffs first establish a *prima facie* case with actors who are not necessarily the decisionmakers, then conduct an analysis to show that the decisionmaker likely acted based on the wrongful behavior of the subordinate. *Marshall*, 854 F.3d at 379-80. Under such an analysis, all three of Peacock-Johnson's claims should survive summary judgment.

I. **Peacock-Johnson has Established *Prima Facie* Cases for All of Her Claims**

   A. **Peacock-Johnson has Established a *Prima Facie* Case for her Sex and Pregnancy Discrimination Claim**

Peacock-Johnson successfully establishes a *prima facie* case of sex and pregnancy discrimination under the KCRA. To establish a *prima facie* case, Peacock-Johnson should show that: (1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment decision; and (4) there is a nexus between her pregnancy and the adverse employment action. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Evolent only argues that Peacock-Johnson cannot establish the fourth element. (DN 35-1, MSJ, PageID #s: 169-72).

Plaintiffs can establish a causal connection using circumstantial evidence. *Asbury University v. Powell*, 486 S.W.3d 246, 258 (Ky. 2016). Circumstantial evidence of a causal connection can be established through proof that:

> (1) the decision-maker [or subordinate of the decision-maker, in the case of Cat's Paw Theory] responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and
> (2) there is a close temporal relationship between the protected activity and the adverse action.

*Id.*

One helpful case here is *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438 (6th Cir. 2002). In *Prebilich*, the plaintiff failed to establish a nexus between her pregnancy and

14

the adverse employment action because the facts demonstrated that the decision to engage in the adverse employment action was made before the employer learned of her pregnancy. *Id.* at 443. The court noted that "an employer may well have no knowledge of the early stages of an employee's pregnancy unless the employee has made her circumstances known to the employer[.]" *Id.* When the evidence shows that the pregnancy might have been known, an employer cannot claim a lack of knowledge. *Id.* "If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant." *Id.* at 444 (internal citations omitted).

In *Prebilich*, the fact that the employer initiated the plaintiff's termination process before learning of the plaintiff's pregnancy was unrefuted. *Id.* Here, however, all that is alleged is that Peacock-Johnson was being *considered* for a reduction in force along with 66 other employees at the beginning of February.[1] By the time that list was narrowed down to the final 33, of which Peacock-Johnson was one, the human resources department had unquestionably been alerted to Peacock-Johnson's pregnancy and intent to take FMLA leave. Devlin, who had access to the HR

---

[1] While Riley claims in her Declaration that she created the first reduction in force draft spreadsheet on February 7, 2020, she does not point to anything in the record that she alleges is that spreadsheet. (DN 35-7, Riley Declaration, par. 7, PageID #: 280). Ventimiglia also does not point to anything in the record purporting to be the first list of names. (DN 35-8, Ventimiglia Declaration, par. 8, PageID #: 367). Nonetheless, Evolent represents in its motion for summary judgment that the "documentary evidence shows that Ms. Riley had put Plaintiff on the RIF List by February 7, 2020, *seven days before* she told anyone at Evolent that she was pregnant." (DN 35-1, PageID #: 170). No documentary evidence supports this claim other than Riley's Declaration, and Peacock-Johnson was given no opportunity to press Riley as to why she was so confident that Peacock-Johnson was on that original spreadsheet. After all, Evolent did not produce that spreadsheet, and Ventimiglia stated in his Declaration that employees were added after the original spreadsheet was drafted. (DN 35-8, Ventimiglia Declaration, par. 8, PageID #: 367). Either the spreadsheet does not exist and Riley is claiming to have a vivid memory of a spreadsheet 20 months after creating it, or the spreadsheet does exist and Evolent just chose not to produce the spreadsheet. Neither is an acceptable explanation.

15

email inbox and likely the Pregnancy Tracking Spreadsheet, was involved in selecting the final employees to be terminated. Peacock-Johnson was succeeding enough at Evolent that she had just recently been transferred to another department, her position would need to be backfilled, she was not on any sort of improvement plan, her supervisor was not aware of any performance issues, and no notes had been made about reasons to terminate her. A reasonable jury could infer that Devlin learned about Peacock-Johnson's pregnancy before the decision was made to terminate her.

### B. Peacock-Johnson has Established a *Prima Facie* Case for her FMLA Interference Claim

Peacock-Johnson successfully establishes a *prima facie* case of interference under the FMLA. FMLA interference involves five elements:

(1) [plaintiff] is an eligible employee,
(2) the defendant is an employer as defined under the FMLA,
(3) the employee was entitled to leave under the FMLA,
(4) the employee gave the employer notice of [her] intention to take leave, and
(5) the employer denied the employee FMLA benefits to which [she] was entitled.

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016). Evolent appears to concede that Peacock-Johnson establishes a *prima facie* case of interference, and instead claims Peacock-Johnson cannot establish pretext. (DN 35-1, MSJ, PageID #s: 174-75). That analysis will be conducted below.

### C. Peacock-Johnson has Established a *Prima Facie* Case for her FMLA Retaliation Claim

Peacock-Johnson successfully establishes a *prima facie* case of retaliation under the FMLA. Establishing a *prima facie* case involves four elements:

(1) she exercised a right protected by the FMLA;
(2) the employer knew she exercised that right;
(3) she suffered an adverse employment action; and
(4) a causal connection between her protected activity and the adverse employment action.

16

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). Evolent argues that Peacock-Johnson cannot establish elements two, three, or four. (DN 35-1, MSJ, PageID #s: 172-74). All three of those elements are encompassed in the "nexus" element that was previously analyzed under the KCRA *prima facie* case analysis.

## II. Peacock-Johnson has Established Sufficient Employer Knowledge Under the Cat's Paw Theory

"The cat's paw theory addresses situations in which decisionmakers unthinkingly adopt the recommendations of their biased lower-level supervisors[.]" *Marshall*, 854 F.3d at 378. It is unclear who the decisionmaker was here. Evolent identified Scott Fad as the decisionmaker, but he denied being a decisionmaker. Evolent identified Kelly Riley as a decisionmaker for the very first time in its Motion for Summary Judgment, creating a situation where Peacock-Johnson did not have proper notice to investigate Riley. However, we know that Devlin was working with Fad and Riley on narrowing down the preliminary reduction in force list to the final half of considered employees who were finally terminated.

A reasonable jury could find that Devlin had access to the knowledge that Peacock-Johnson was pregnant and requesting FMLA leave through two means: the Talent Team/HR inbox from Peacock-Johnson's original email inquiry, and from Waiters's entry of Peacock-Johnson's information into Evolent's Pregnancy Tracking Spreadsheet to which Devlin's department had access. A reasonable jury could infer that Devlin shaped the judgement of the decisionmakers and is the reason Peacock-Johnson was on the final reduction in force list even though she was outperforming her comparators and Evolent had just invested in her by moving her to a new department.

**III. A Reasonable Jury Could Find that the Reasons Provided by Evolent for Peacock-Johnson's Termination are Pretext for Discrimination, Interference, and Retaliation**

Peacock-Johnson can show that the alternative reasons for her termination provided by Evolent were merely pretext in that they (1) have no basis in fact; (2) did not actually motivate the employer's challenged conduct; and/or (3) were insufficient to warrant the challenged conduct. *Brooks v. Davey Tree Expert Co.*, 478 Fed. Appx. 934, 941 (6th Cir. 2012). Only one of these three needs to be satisfied to establish pretext. *Id.* Evolent claims that it made the decision to terminate Peacock-Johnson before she disclosed that she was pregnant and seeking FMLA leave, and it claims that its decisionmakers did not find out that she was pregnant and seeking FMLA leave until after her termination had been announced. A reasonable jury could find that these reasons have no basis in fact, did not actually motivate Evolent's conduct, and were also insufficient to warrant terminating Peacock-Johnson.

Under Supreme Court case *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000), "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147 (emphasis removed). Peacock-Johnson allegedly being on an initial list of people with 2019 performance review ratings of 2 or below does not equate a decision to terminate her. Only half of the individuals on the initial list were terminated. No reasons were ever provided in the "notes" sections of the various spreadsheets to support Peacock-Johnson's termination, it was noted that her position would have to be backfilled with a United States worker, she had been succeeding enough to get a transfer to a new department, she had never been on an improvement plan, and Evolent did ultimately have to replace her with new analysts. Peacock-Johnson receiving a "2" on her 2019 performance review from someone who wasn't even her supervisor anymore did not warrant termination compared to the performance issues of other employees being considered. A reasonable jury could find that Evolent engaged in

18

pretext from its nonsensical reasoning in selecting Peacock-Johnson to be in the final group of terminated employees after she had broadcast to the human resources department that she was pregnant and seeking FMLA leave.

## CONCLUSION

For the above-stated reasons, Peacock-Johnson respectfully requests that this Court deny Evolent's motion for summary judgment and allow Peacock-Johnson's case to continue to trial.

    Respectfully submitted,

*/s/ Abigail V. Lewis*
Garry R. Adams
Abigail V. Lewis
ADAMS LANDENWICH WALTON, PLLC
517 W. Ormsby Ave.
Louisville, Kentucky 40203
(502) 561-0085
garry@justiceky.com
abigail@justiceky.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that today, November 16, 2021, the foregoing was filed with the electronic filing system of the court, which will alert all parties to this action.

*/s/ Abigail V. Lewis*
Garry R. Adams
Abigail V. Lewis